# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONTAY HAYES, CDC #K-88757,<br><br>            Plaintiff,<br><br>   vs.<br><br>SILVIA GARCIA, Warden,<br><br>            Defendant. | Civil No.   04-2112 IEG (NLS)<br><br>**ORDER GRANTING DEFENDANT GARCIA'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED.R.CIV.P. 56(c) AND TERMINATING CASE**<br><br>**[Doc. No. 61-1]** |

## I.

### STATEMENT OF THE CASE

Dontay Hayes ("Plaintiff"), a state prisoner currently incarcerated at Calipatria State Prison ("CAL"), is proceeding pro se and *in forma pauperis* with a Second Amended Complaint ("SAC") filed pursuant to the Civil Rights Act, 42 U.S.C. § 1983. Plaintiff alleges that CAL's Warden Silvia Garcia denied him all outdoor exercise from December 27, 2001, through September 25, 2002, in violation of the Eighth Amendment. (SAC at 4.)

Currently pending before the Court is Defendant Garcia's Motion for Summary Judgment pursuant to FED.R.CIV.P. 56 [Doc. No. 61].

/ / /

## II.

## PROCEDURAL BACKGROUND

Defendant Garcia moves for summary judgment on grounds that: (1) no genuine issues of material fact exist to show she violated Plaintiff's Eighth Amendment rights; and (2) she is entitled to qualified immunity. On September 15, 2006, the Court has advised Plaintiff of his rights and obligations to oppose Garcia's Motion pursuant to *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988) and *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998) (en banc).[1] Plaintiff filed his Opposition on October 19, 2006 [Doc. No. 70]. Moreover, Plaintiff's Second Amended Complaint is verified under penalty of perjury. *See Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) (holding that a complaint or motion duly verified under penalty of perjury pursuant to 28 U.S.C. § 1746 may be used as an opposing affidavit under FED.R.CIV.P. 56.).

Having now exercised its discretion to consider the matter as submitted on the papers without oral argument pursuant to S.D. CAL. CIVLR 7.1.d.1, the Court hereby GRANTS Defendant Garcia's Motion for Summary Judgment pursuant to FED.R.CIV.P. 56(c) for the reasons set forth in detail below.[2]

---

[1] *Klingele* and *Rand* together require the district court "'as a bare minimum, [to provide a pro se prisoner] with fair notice of the requirements of the summary judgment rule.'" *Klingele*, 849 F.2d at 411 (quoting *Hudson v. Hardy*, 412 F.2d 1091, 1094 (D.C. Cir. 1968)). "It would not be realistic to impute to a prison inmate ... an instinctual awareness that the purpose of a motion for summary judgment is to head off a full-scale trial by conducting a trial in miniature, on affidavits, so that not submitting counter affidavits is the equivalent of not presenting any evidence at trial." *Jacobsen v. Filler*, 790 F.2d 1362, 1364 n.4 (9th Cir. 1986) (internal quotation omitted). Actual knowledge or any level of legal sophistication does not obviate the need for judicial explanation. *Klingele*, 849 F.2d at 411-12. Thus, the district court is required to "tell the prisoner about his 'right to file counter-affidavits or other responsive materials and [to][ alert[] [him] to the fact that his failure to so respond might result in the entry of summary judgment against him.'" *Jacobsen*, 790 F.2d at 1365 n.8 (quoting *Klingele*, 849 F.2d at 411).

[2] While this case was randomly referred to the Honorable Magistrate Judge Nita L. Stormes pursuant to 28 U.S.C. § 636(b)(1)(B) for disposition, the Court has determined that a Report and Recommendation regarding the disposition of Defendant Garcia's pending Motion for Summary Judgment is unnecessary. *See* S. D. CAL. CIVLR 72.3(a) (assigning "[a]ll of the District's civil §1983 prisoner caseload" to the District's magistrate judges for disposition either upon consent of all parties, or in absence of unanimous written consent, "upon submission of proposed findings and recommendations to the district judge, unless the district judge orders otherwise.").

## III.

## FACTUAL BACKGROUND

Plaintiff alleges that Warden Garcia deprived him of outdoor exercise from December 27, 2001 through September 25, 2002, in violation of his Eighth Amendment right to be free from cruel and unusual punishment. (Compl. at 3.)

In support of his claim, Plaintiff's Opposition and Second Ad mended Complaint both refer to numerous documents including inmate appeal/parolee CDC 602 grievance forms, correspondence and "Program Status Reports" which provide most of the factual background.[3] These documents, as well as Defendant Garcia's Declaration in Support of Summary Judgment [Doc. No. 63], show that a riot first occurred between African-American and Caucasian inmates on or about December 2, 2001 in CAL's "B" Facility. (Pl.'s Ex., Inmate/Parolee Inmate Appeal Form, Log No. CAL-B-02-00517, dated February 28, 2002; Garcia Decl. ¶ 5.) "As a result of this riot, [Garcia] placed B Facility on Modified Program beginning December 3, 2001." (Garcia Decl. ¶ 5.) The "modified program" included cell feeding, controlled showers, and critical worker" movement only. Further, library access limited to only "inmates with verified court deadlines" and "30- minute non-contact visits." (*Id.*) According to Garcia, this modified program was implemented for "safety and security while the cause of the riot was investigated and the yards and common areas were searched for weapons." (*Id.*) On December 11, 2001, after searches were complete, Garcia ordered that the modified programming plan be continued for the African-Americans and Caucasian inmates, and restoration of "normal programming" for all other inmates. (*Id.* at 6.)

According to CDC 602 Group Appeal Log No. CAL-B-02-00517, "[o]n December 27, 2001, in an attempt to return to normal program, Facility 'B' was conducting release to the morning meal when a racially motivated stabbing incident occurred." (*See also* Garcia Decl. ¶ 10.) An African-American inmate was killed by a Caucasian inmate on Facility B, Yard 1.

---

[3] The court may consider documents or exhibits "whose contents are alleged in a complaint and whose authenticity no party questions." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *Hal Roach Studios v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 (9th Cir. 1990).

(*Id.*) As a result of the homicide, and other incidents of inmate-on-inmate violence in other facilities, Garcia obtained permission to declare a state of emergency and imposed an "institutional lockdown."[4] (*Id.*)

The December 27, 2001 lockdown continued until January 8, 2002, when a "modified program," including yard privileges for inmates in Facilities A, C, and D, was reinstated. (*Id.* ¶ 11.) Other privileges were restored gradually, and by February 5, 2002, all inmates--other than the African-American and Caucasian inmates, who continued on a modified schedule due to "continuing intelligence that racial violence was likely" to reoccur--were restored to "normal' programming. (*Id.* ¶ 13.)

From February 5, 2002 through April 7, 2002, Garcia gradually reintroduced normal program privileges to the African-American and Caucasian inmates in Facility B. (*Id.* ¶ 14.) On April 7, 2002, however, a Caucasian inmate attacked a fellow Caucasian inmate with a weapon in Unit B5, causing him serious injury. (*Id.* ¶ 15.) On the following day, inmates engaged in a work stoppage. As a result of these two incidents, Facility B was ordered back to modified programming so that searches could be completed. During this time, Caucasian inmates were placed on higher restriction status than African-Americans. (*Id.*) Nevertheless, on April 20, 2002, a "mutual combat" occurred in Unit B3, involving two Caucasian and five African-American inmates. (*Id.* ¶ 16.)

By May 20, 2002, normal programming was restored to all inmates except the African-Americans and Caucasians, who remained on a modified program. (*Id.* ¶ 17.) In addition, Defendant Price presented Warden Garcia with a plan to restore some yard privileges to the African-American and Caucasian inmates in Facility B beginning on May 23, 2002 at randomly

---

[4] CAL. CODE REGS., tit. 15 § 3383 (a) provides that "[a] state of emergency shall exist when the institution head ... temporarily suspends any nonessential operation, procedure, service, or function, and the normal time limits or schedules for such activity in order to prevent, contain, or control a disturbance." A "lockdown" occurs when "a portion of the facility is affected by suspension of required programs or services, and inmates are not released except as determined by the facility administration on an individual[], case-by-case basis.... [U]nder such circumstances only critical inmate workers in the affected housing units/sub-facilities will be permitted to attend work assignments under escort, and all but essential functions are suspended in those affected housing units or sub-facilities, e.g., yard, canteen draws, religious services, and visiting." CAL. CODE REGS., tit. 15 § 3000.

1    selected and unannounced times. (*Id.* ¶ 17.) However, on May 23, 2002 and again on May 24,
2    2002, race riots re-erupted between the African-American and Caucasian inmates who had been
3    randomly selected for yard release. (Garcia Decl. ¶¶ 19-20.) Based on these riots and Price's
4    opinion that the African-American and Caucasian inmates in Facility B were "not ready for yard
5    release, and that more time and effort were required to ensure the safety and security of inmates
6    and staff," Garcia "temporarily suspended all privileges" for African-Americans and Caucasians,
7    except for law library access, showers, medical appointments" and issued "other passes under
8    escort only." (Garcia Decl. ¶ 20.)

9    On July 10, 2002, in-cell canteen purchases were restored in Facility B, "as the first phase
10   in a transition to normal programming." (*Id.* ¶ 21.) On July 11, 2002, five Hispanic inmates in
11   Facility A stabbed a correctional officer and injured other staff. (*Id.*¶ 22.) As a result the entire
12   institution was placed on lockdown pending investigation into the Facility A incident; however
13   the African-American and Caucasian inmates in Facility B continued on a modified program
14   until July 28, 2002, when Garcia re-imposed an institutional lockdown after an African-
15   American inmate committed a battery on another correctional officer. (*Id.* ¶¶ 22-23.)

16   After an August 6, 2002 investigation revealed that the July 28, 2002 incident was an
17   "isolated" one, Garcia lifted the lockdown for inmates identified as Hispanic or "Other." (*Id.*
18   ¶ 24.) However, because the same investigation indicated that African-American and Caucasian
19   still had "ongoing problems," Garcia maintained their modified program restrictions. (*Id.*) On
20   August 9, 2002, a meeting was held with six African-American and Caucasian inmate
21   representatives; however the African-Americans "refused to participate and left the meeting."
22   (*Id.* ¶ 25.) Thereafter, a Caucasian inmate "who had attempted to mediate between the groups,
23   was subsequently assaulted because of his efforts." (*Id.*)

24   "Because of these events, [Garcia] decided to retain African-American and Caucasian
25   inmates on B Facility on a modified program status until tension abated." (*Id.*) By September
26   3, 2002, "additional agitators had been identified and transferred." (*Id.* ¶ 26.) Restrictions were
27   lifted, beginning with authorized quarterly packages on August 20, 2002, and on September 23,
28   2002, unit-by-unit dining room feeding, canteen, telephone and "normal" yard privileges were

permitted.  (*Id.* ¶ 28.)  However, "on the same day," another riot erupted when a group of African-American inmates assaulted a group of Caucasian inmates.  (*Id.* ¶ 29.)  All involved were placed in administrative segregation, but Facility B was again returned to modified programming.  (*Id.*)  Facility B remained on a modified program schedule until October 5, 2002, when African-American and Caucasian critical workers were released for work assignments and were granted 30-minute non-contact visitation privileges.  (*Id.* ¶ 30.)

Plaintiff alleges his yard privileges were restored on September 25, 2002.  (SAC at 3.) He seeks $150,000 in general and $150, 000 in punitive damages.  (*Id.* at 6.)

## IV.

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**A.     Standard of Review**

Summary judgment is properly granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law."  FED.R.CIV.P. 56(c). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court shall consider all admissible affidavits and supplemental documents submitted on a motion for summary judgment.  *See Connick v. Teachers Ins. & Annuity Ass'n*, 784 F.2d 1018, 1020 (9th Cir. 1986).

The moving party has the initial burden of demonstrating that summary judgment is proper.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970).  However, to avoid summary judgment, the nonmovant cannot rest solely on conclusory allegations.  *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986).  Rather, he must present "specific facts showing there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The Court may not weigh evidence or make credibility determinations on a motion for summary judgment.  Quite the opposite, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.  *Id.* at 255; *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  The nonmovant's evidence need only be such that a "fair minded jury could return

a verdict for [him] on the evidence presented." *Anderson*, 477 U.S. at 255. However, in determining whether the nonmovant has met his burden, the Court must consider the evidentiary burden imposed upon him by the applicable substantive law. *Id.*

A verified complaint or motion may be used as an opposing affidavit under FED.R.CIV.P. 56 to the extent it is based on personal knowledge and sets forth specific facts admissible in evidence. *McElyea v. Babbitt*, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curiam) (complaint); *Johnson v. Meltzer*, 134 F.3d 1393, 1399-1400 (9th Cir. 1998) (motion). To "verify" a complaint, the plaintiff must swear or affirm that the facts in the complaint are true "under the pains and penalties of perjury." *Schroeder v. McDonald*, 55 F.3d 454, 460 n.10 (9th Cir. 1995).

### B. Defendant's Arguments

Defendant Garcia argues she is entitled to judgment as a matter of law pursuant to FED.R.CIV.P. 56 because: 1) no genuine issues of material fact exist to show that the restrictions of Plaintiff's access to outdoor exercise deprived him of the "minimal civilized measure of life's necessities," (Def.'s P&As at 14-15, *citing Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); and 2) no triable issue of fact exists to show that she acted with deliberate indifference to Plaintiff's health or safety. (*Id.* at 837.) Defendant further argues she is entitled to qualified immunity. (*Id.* at 20-24, *citing Saucier v. Katz*, 533 U.S. 194, 200 (2001).)

#### 1.  42 U.S.C. § 1983

Section 1983 authorizes a "suit in equity, or other proper proceeding for redress" against any person who, under color of state law, "subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution." *Nelson v. Campbell*, 541 U.S. 637, 124 S.Ct. 2117, 2122 (2004). Here, there is no dispute that Warden Garcia acted under color of state law when she ordered implementation of lockdown procedures at CAL which limited Plaintiff's access to outdoor exercise from December 27, 2001, through September 27, 2002. Thus, the resolution of her Summary Judgment Motion turns on the second inquiry: whether a genuine issue of material fact exists to show that Garcia's actions constituted cruel and unusual punishment in violation of Plaintiff's Eighth Amendment rights.

### 2. Eighth Amendment's Cruel and Unusual Punishments Clause

"Whatever rights one may lose at the prison gates, ... the full protections of the eighth amendment most certainly remain in force. The whole point of the amendment is to protect persons convicted of crimes." *Spain v. Procunier*, 600 F.2d 189, 193-94 (9th Cir. 1979) (citation omitted). The Eighth Amendment, however, is not a basis for broad prison reform. It requires neither that prisons be comfortable nor that they provide every amenity that one might find desirable. *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981); *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982). Rather, the Eighth Amendment proscribes the "unnecessary and wanton infliction of pain," which includes those sanctions that are "so totally without penological justification that it results in the gratuitous infliction of suffering." *Gregg v. Georgia*, 428 U.S. 153, 173, 183 (1976); *see also Farmer*, 511 U.S. at 834; *Rhodes*, 452 U.S. at 347. This includes not only physical torture, but any punishment incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976).

Although prison administrators generally have broad discretion in determining whether to declare emergencies and impose "lockdowns" to control institutional disturbances, the conditions imposed during the lockdown may constitute cruel and unusual punishment under the Eighth Amendment. *See Hayward v. Procunier*, 629 F.2d 599, 603 (9th Cir. 1980) (denial of outdoor exercise may give rise to Eighth Amendment violation even in response to emergency conditions). To assert an Eighth Amendment claim for deprivation of humane conditions of confinement, a prisoner must satisfy two requirements: one objective and one subjective. *Farmer*, 511 U.S. at 834; *Allen v. Sakai*, 48 F.3d 1082, 1087 (9th Cir. 1994).

"Under the objective requirement, the prison official's acts or omissions must deprive an inmate of the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. This objective component is satisfied so long as the institution "furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety." *Hoptowit*, 682 F.2d at 1246; *Farmer*, 511 U.S. at 833; *Wright v. Rushen*, 642 F.2d 1129, 1132-33 (9th Cir. 1981).

The subjective requirement, relating to the defendants' state of mind, requires "deliberate indifference." *Allen*, 48 F.3d at 1087. "Deliberate indifference" exists when a prison official "knows of and disregards an excessive risk to inmate health and safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 835.

### a. Objective Requirement

Plaintiff alleges that the conditions resulting from Garcia's decision to implement lockdown and modified lockdown restrictions constituted cruel and unusual punishment because, as a result of those restrictions, he was denied outdoor exercise for nearly ten months. (SAC at 3.) The Ninth Circuit has stated that "regular outdoor exercise is extremely important to the psychological and physical well being of the inmates." *Spain*, 600 F.2d at 199 (holding that prisoners in long-term and continuous segregation must be provided regular outdoor exercise unless "inclement weather, unusual circumstances, or disciplinary needs" make it impossible). However, as the Ninth Circuit further recognized in *Hayward,* when a lockdown is instituted in response to a genuine emergency, the decisions regarding when and how to provide for outdoor exercise "are delicate ones, and those charged with them must be given reasonable leeway." *Hayward*, 629 F.2d at 603.

Here, the record is clear that the initial restrictions placed on Plaintiff's ability to exercise outdoors arose from racial tension and rioting between approximately twenty Caucasian and African-American inmates beginning on December 2, 2001, in CAL's Facility B. (Garcia Decl. ¶ 5.) As a result of the riot, Warden Garcia implemented modified programming for Facility B which took effect the next day, and which provided for in-cell feeding, controlled showers, library access for inmates with verified court deadlines, thirty-minute non-contact visits, and out-of-unit movement of Hispanic and Other critical inmate workers. (*Id.*) The restrictions were in the process of being lifted when, on December 27, 2001, a Caucasian inmate killed an African-American inmate and the entire facility was placed on lock down. (*Id.* ¶ 10) The lockdown ended on January 8, 2002, and by February 5, 2002, all inmates at CAL, except the Caucasian and African-American inmates on Facility B, had returned to normal programming. (*Id.* ¶¶ 11-

1 13.) Garcia attempted to return Facility B to "normal programming" at least 3 separate times between the December 27, 2001 homicide and September 27, 2002, when Plaintiff, who is an African-American inmate who was housed in Facility B, claims his outdoor exercise privileges were restored. (*Id.* at ¶¶ 13, 16, 18, 20.)

"Although exercise is 'one of the basic human necessities protected by the Eighth Amendment' ... a temporary denial of outdoor exercise with no medical effects is not a substantial deprivation." *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (twenty-two days insufficient to establish Eighth Amendment violation) (*quoting LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993)). Here, although Plaintiff claims he was denied outdoor exercise for nearly nine months from December 27, 2001 through September 27, 2002, and not just "temporarily," *May*, 109 F.3d at 565, Defendant argues he was not denied exercise altogether, but rather, only the opportunity to exercise outdoors. Specifically, Defendant claims the conditions of Plaintiff's confinement during the 9 1/2-month lockdown do not satisfy the objective component of an Eighth Amendment violation because Plaintiff "was not confined to his cell during the entire lockdown period," his cell was "large enough to perform various exercises, including pushups, situps, biceps curls, leg squats, running in place and stretching" and he was permitted to go to the law library and dental clinic. (Garcia Decl. ¶ 38.)

Under the circumstances of this case and Ninth Circuit precedent, however, the Court finds evidence in the record sufficient to create genuine issues of fact as to whether the denial and/or limitations on Plaintiff's outdoor exercise for a period of just over nine months meets the objective standards required to support an Eighth Amendment violation. *See e.g., Lopez v. Smith*, 203 F.3d 1122, 1133 (9th Cir. 2000) (en banc) (finding six and one-half weeks deprivation of "all access to outdoor exercise" sufficient to satisfy Eighth Amendment's objective requirements); *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996), *as amended* 135 F.3d 1318 (finding triable issues of facts existed as to whether a six-month deprivation of outdoor exercise due to Plaintiff's placement in the Intensive Management Unit violated the Eighth Amendment).

////

### b.    Subjective Requirement

However, in order to avoid summary judgment, Plaintiff must also show there are triable issues as to the Eighth Amendment's subjective requirement.  *Farmer*, 511 U.S. at 834.  In this regard, the Court finds no evidence in the record to support Plaintiff's claim that the denial of outdoor exercise, which began as a result of racial tension and violence which culminated in an inmate's murder in CAL's B Facility, was the result of Defendant's "deliberate indifference."  *Farmer*, 511 U.S. at 835; *Lopez*, 203 F.3d at 1133.

The evidence before the Court shows that the suspension of outdoor exercise began after racial tensions in Facility B erupted on December 2, 2001; on that day a riot involving approximately twenty Caucasian and African-American inmates occurred in Housing Unit B3. (Garcia Decl. ¶ 5.)  One inmate sustained serious injury and one weapon was recovered, and Garcia instituted a modified program schedule for Facility B on the day after.  (*Id.*)  Garcia indicates she first instituted those restrictions "for the safety and security while the cause of the riot was investigated, and the yards and common area were searched for weapons."  (*Id.*)  The searches were completed by December 11, 2001, and although modified programming continued for African-Americans and Caucasian inmates, normal programming was restored for all other inmates.  (*Id.* ¶ 6.)

A review of the documents submitted by Defendant indicates that racial tensions between Caucasian and African-American inmates during the relevant time periods. (*Id.* ¶ 41).  Indeed, Garcia recounts that between December 2, 2001 and September 27, 2002, and despite the institution's best efforts to restrict opportunities for further violence, Facility B was the site of four race riots. (*Id.* ¶¶ 5, 10, 16, 19, 20.)  Each attempt to lift programming restrictions and re-integrate the African-American and Caucasian inmates was met with further violence. (*Id.*)  On many occasions, inmates were found to possess weapons, several inmate-on-inmate batteries occurred without serious injury, and six occurred with serious injuries. (*Id.*)  Plaintiff, for his part, points to absolutely no evidence in the record to rebut this testimony of events.

////

////

1    Thus, the record is replete with facts which reveal that restrictions on outdoor exercise
2 were instituted for the primary purpose of preventing further race-based attacks, injuries and
3 homicides. In addition, Warden Garcia claims, and all documentary evidence offered by both
4 Plaintiff as well as Defendant Garcia shows, that the restrictions in Facility B were designed and
5 continually modified in an effort to "stop [the] racially-motivated violence, secure the safety of
6 all inmates and institutional staff, protect institutional property, facilitate an investigation into
7 the racially motivated riots and their causes, determine the likelihood and nature of future
8 violence, and discover and confiscate inmate manufactured weapons and contraband." (Garcia
9 Decl. ¶ 40.) There is simply no evidence before this Court which supports Plaintiff's claims that
10 Garcia's actions were the product of any "deliberate indifference" on her part. *Farmer*, 511 U.S.
11 at 837.

12   As noted above, determinations such as how to best protect inmates from racial violence
13 "are delicate ones, and those charged with them must be given reasonable leeway." *Hayward*,
14 629 F.2d at 602. Defendant Garcia has demonstrated as a matter of law that yard restrictions in
15 Facility B were imposed as a result of a serious racial instability, that each time she attempted
16 to relax those restrictions further violence immediately erupted, and that integrated yard release
17 in Facility B was slow and, at times, impossible. Thus, without more, this Court finds no
18 genuine issues of material fact exist to show that Garcia deprived Plaintiff of outdoor exercise
19 with the "deliberate indifference" to his health or safety necessary to support an Eighth
20 Amendment violation. *See Farmer*, 511 U.S. at 835. Rather, the uncontroverted evidence
21 establishes that the suspension of outdoor exercise was a response to ongoing and sometimes
22 even deadly racial violence. Plaintiff has come forward with no evidence to support a finding
23 that the initial suspension or delay in restoration of outdoor exercise amounted to a violation of
24 his Eighth Amendment rights.

25   Accordingly, Defendant Garcia is entitled to summary judgment as a matter of law.
26 *Celotex*, 477 U.S. at 322-24; *Anderson*, 477 U.S. at 256; *Berg*, 794 F.2d at 459.
27 ////
28 ////

### 3. Qualified Immunity

Because the Court has found no violation of Plaintiff's Eighth Amendment rights, the Court need not reach any issues regarding qualified immunity. *See County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[The better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all."); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

## IV.

### CONCLUSION AND ORDER

For all the reasons set forth in the Order the Court hereby GRANTS Defendant Garcia's Motion for Summary Judgment pursuant to FED.R.CIV.P. 56 [Doc. No. 61-1].

The Clerk shall enter judgment for Defendant Garcia and close the file.

**IT IS SO ORDERED.**

**DATED:  October 27, 2006**

_____
**IRMA E. GONZALEZ, Chief Judge
United States District Court**